Hans VON LANGE and Richard Von
Lange, Plaintiffs,

v.

MORRISON-KNUDSEN COMPANY,
INC., Defendant.

Civ. A. No. 77-26.

United States District Court,
M. D. Pennsylvania.

Nov. 16, 1978.

**644**

Eugene R. Campbell, Smith & McCleary, York, Pa., for plaintiffs.

Arthur J. Schlanger, Assoc. Gen. Counsel, Morrison-Knudsen Co., Inc., Boise, Idaho, George J. Miller, Bernard A. Ryan, Jr., Manuel Gottlieb, Dechert, Price & Rhoads, Harrisburg, Pa., for defendant.

## MEMORANDUM

HERMAN, District Judge.

A non-jury trial was held on this contract action on September 20, 1978 and the parties have now submitted proposed findings of fact and conclusions of law. Judgment will be entered for the Defendant on all counts. The following are the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Hans Von Lange is an individual who at all times relevant to this action has resided at R.D. Number 3, Stewartstown, Pennsylvania and has been a citizen of the Commonwealth of Pennsylvania.

2. Plaintiff Richard Von Lange is an individual who at the time this suit was filed resided at R.D. Number 3, Stewartstown, Pennsylvania and was a citizen of the Commonwealth of Pennsylvania and who now resides at 1073 Cardington Way, Cockeysville, Maryland and is a citizen of the state of Maryland.

3. Defendant Morrison-Knudsen Company, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 1 Morrison-Knudsen Plaza, Boise, Idaho and is a citizen of the states of Delaware and Idaho.

4. The amount in controversy, exclusive of interest and costs, exceeds $10,000.

5. At all times relevant to this action Hans Von Lange has been president and majority shareholder of a New York corporation known as Intma, Inc. (Intma).

6. At all times relevant to this action Richard Von Lange has been an employee of Intma.

7. For a period of time prior to April 1, 1973 Intma manufactured bonded rail joints in York, Pennsylvania under a license from a German corporation, Klockner Werke A.G. (Klockner) and Hans and Richard Von Lange were actively engaged in marketing the bonded rail joints for Intma.

8. Prior to manufacturing the bonded rail joints in York, Pennsylvania, Intma, Inc., had marketed rail joints manufactured in Germany by Klockner. It soon became apparent that it was uneconomical to ship rails to Germany for processing and then back to the United States. This was necessary because compatible rails were not available in Europe.

9. Intma quickly incurred financial problems and in order to aid Intma, Klockner advanced approximately four hundred thousand dollars and helped it obtain a loan from the Privat Bank of Lichtenstein in the sum of approximately two hundred thousand dollars.

10. In mid-1973 Klockner informed Intma that it would not make further loans to Intma and that due to other calls on its resources, it wished to reduce substantially or eliminate its debt position in Intma.

11. As a result of Klockner's decision, Hans Von Lange made a number of attempts in the latter part of 1973 to sell Intma, but these attempts were unsuccessful, primarily because of the size of Intma's indebtedness to Klockner.

12. Early in 1974, through mutual contacts in the railroad business, Hans Von Lange and Morrison-Knudsen Company, Inc. ("Morrison-Knudsen") began to discuss the possibility of Morrison-Knudsen acquiring Intma or entering into a partnership arrangement with it. Both sides believed that such an arrangement could be advantageous to Morrison-Knudsen, since that company was anxious to expand its railroad products division, which did not then offer a product such as the Intma bonded rail joint.

13. Hans Von Lange and Bernard J. Wald, a New York attorney who represented Intma, were the principal negotiators for Intma in its negotiations with Morrison-Knudsen.

14. Leon D. Stoddard, a Morrison-Knudsen vice-president, and Arthur J. Schlanger, a Morrison-Knudsen attorney, were the principal negotiators for Morrison-Knudsen in its negotiations with Intma.

15. During the negotiations it was decided that Morrison-Knudsen would not acquire Intma but would enter into a partnership with Intma to be known as the M-K I-Bond Company. These negotiations culminated in the execution by Intma and Morrison-Knudsen in July, 1974 of a "Partnership Agreement" to be effective as of April 1, 1974.

16. It was also decided during the negotiations that there should be an agreement between Morrison-Knudsen and Hans and Richard Von Lange to provide for the continuation of the Von Langes as salesmen of the bonded rail joints on behalf of the M-K I-Bond Company. This decision led to the execution in July, 1974 of a "Sales Representative Agreement" by Morrison-Knudsen and Hans and Richard Von Lange, also retroactive to April 1, 1974.

17. The final version of the Sales Representative Agreement that was eventually signed was drafted by Bernard Wald.

18. Hans and Richard Von Lange considered the Sales Representative Agreement to be an integral part of the overall arrangement between Intma and Morrison-Knudsen.

19. The Partnership Agreement between Intma and Morrison-Knudsen referred to and was expressly contingent upon the execution of the Sales Representative Agreement.

20. Hans Von Lange, the president, majority shareholder and principal negotiator for Intma, would not have agreed to the proposed partnership with Morrison-Knudsen on the terms set forth in the Partnership Agreement without the Sales Representative Agreement.

21. The benefits which were conferred on Hans and Richard Von Lange under the Sales Representative Agreement resulted from Hans Von Lange's commitment of Intma to the M-K I-Bond partnership.

22. The Sales Representative Agreement and the Partnership Agreement were intended by the parties and considered by Hans and Richard Von Lange to be a single business arrangement.

23. The Sales Representative Agreement and the Partnership Agreement were prepared and intended by the parties to embody the entire agreement between them.

24. Under paragraph 4 of the Sales Representative Agreement Morrison-Knudsen was to pay to the Von Langes $4,500 per month as an "advance" against commissions "[i]n view of the expenses the [Von Langes] may be required to incur in performing their obligations pursuant to this agreement . . . .". Under specified circumstances the Von Langes were entitled to retain any excess of these $4,500 advances over commissions actually earned as "compensation . . . for services rendered".

25. Under paragraph 6 of the Sales Representative Agreement the Von Langes were granted certain specific rights to commissions on orders in process and on orders obtained for three years into the future if the Sales Representative Agreement expired or was terminated.

26. The Sales Representative Agreement does not set forth under what circumstances the Von Langes' services could be terminated prior to the expiration of the three-year initial term.

27. The Partnership Agreement provides in paragraph "P" that:

"M–K [Morrison-Knudsen] shall have the right to withdraw from the partnership at the end of any fiscal year upon mailing written notice of its intention to Intma. Said notice shall be mailed at least ninety (90) days prior to the close of the fiscal year."

28. The Partnership Agreement provided further in paragraph "Q" that if Morrison-Knudsen exercised this right of withdrawal, Intma had the right to purchase Morrison-Knudsen's interest in the partnership. If Intma did not exercise this right, the partnership was to be dissolved and liquidated.

29. On October 1, 1974, which was more than ninety days prior to the close of the 1974 fiscal year, Morrison-Knudsen gave written notice to Intma that it would withdraw from the partnership effective December 31, 1974, and on November 20, 1974 Intma acknowledged and accepted in writing Morrison-Knudsen's withdrawal from the partnership as of December 31, 1974.

30. On November 27, 1974 Intma gave written notice of its intent to exercise its option to purchase, however, Intma could not obtain financing and on December 30, 1974 Hans Von Lange met with Morrison-Knudsen's executive vice-president, E. M. Armstrong, at the Morrison-Knudsen offices in Boise, Idaho to discuss an extension of time in order to give Intma a further opportunity to arrange financing.

31. At the December 30, 1974 meeting the parties agreed to an extension of Morrison-Knudsen's scheduled withdrawal from the partnership and of Intma's purchase option until June 30, 1975.

32. From December 31, 1974 to June 30, 1975 Intma sought unsuccessfully to find a purchaser for Morrison-Knudsen's interest in the partnership or a source of financing which would permit Intma to purchase Morrison-Knudsen's share.

33. The M–K I–Bond business was terminated by agreement of the parties as of June 30, 1975 with such activities as took place thereafter being limited to the filling of existing orders and efforts to find a purchaser for the assets of the partnership.

34. On June 27, 1975 Morrison-Knudsen notified Hans and Richard Von Lange that since it planned to curtail the business of the M–K I–Bond Company after June 30, 1975 it was terminating the services of Hans and Richard Von Lange under the sales Representative Agreement subsequent to June 30, 1975.

35. On September 3, 1975 substantially all of the assets of the M–K I–Bond Company were sold to Harmon Industries, Inc., a Missouri Corporation. Hans Von Lange signed the Agreement of Sale as President of Intma and also approved it in his individual capacity.

36. From June 30, 1975 to September 3, 1975 Plaintiffs continued to solicit orders for bonded rail joints so that Harmon Industries would have a backlog of orders when they took over.

37. Morrison-Knudsen paid to Hans and Richard Von Lange the $4,500 monthly advances required under paragraph 4 of the Sales Representative Agreement up to and including June, 1975 but did not pay any such advances thereafter.

38. The amount in controversy in this action, $94,500 represents the $4,500 per month advances for 21 months (July, 1975 through March, 1977), which would correspond to the remainder of the three-year initial term of the Sales Representative Agreement.

39. On September 25, 1975 Defendant sent to Intma a notice of its intention to withdraw from the partnership as of December 31, 1975. Included in that letter was a "Partnership Dissolution Agreement". Paragraph 7 thereof provided for the termination of the Sales Representative Agreement.

40. Arthur J. Schlanger, Esquire, counsel for Morrison-Knudsen, was away from his office at the time the September 25, 1975 letter and attached proposed Partnership Dissolution Agreement were prepared and sent to Intma and on his return he

advised both Mr. Stoddard and the attorney who had prepared the papers that they were unnecessary under the circumstances.

41. Morrison-Knudsen never had any further contact with Intma, Inc. or Richard Von Lange concerning the September 25, 1975 letter and the proposed Partnership Dissolution Agreement and the proposed Partnership Dissolution Agreement was never in fact signed by any of the parties.

42. The September 25, 1975 letter and proposed agreement did not evidence a belief on Defendant's part that either the partnership or sales representative agreement were still viable at that time.

43. Any action which Hans Von Lange and Richard Von Lange took to solicit orders for the M–K I–Bond partnership after June 30, 1975 were actions which were not authorized by Morrison-Knudsen Company, Inc. and which were not intended by Hans and Richard Von Lange to benefit Morrison-Knudsen Company, Inc.

44. Although the full term of the M–K I–Bond partnership, pursuant to the Partnership Agreement, was three years, it could in fact be terminated by Morrison-Knudsen, whether or not Intma agreed to the termination, at the end of any fiscal year.

45. Considering all of the evidence of the intent and the course of dealing of these parties in forming and operating the M–K I–Bond partnership it appears that the parties intended that the Von Langes' services as sales representatives could be terminated concurrent with the termination of the partnership business and that following such a termination they would be entitled to receive only those commissions which are described in paragraph 6 of the Sales Representative Agreement. This interpretation is that which best accords with the practices of reasonable and prudent businessmen.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction by virtue of diversity of the citizenship of the parties and the fact that the amount in controversy, exclusive of interest and costs exceeds $10,000, 28 U.S.C. § 1332(a).

2. The Partnership Agreement and Sales Representative Agreement constitute and evidence a single transaction and therefore they must be construed together.

3. The termination of the M–K I–Bond Company business on July 1, 1975 also served as a termination of the sales representative agreement.

4. Alternatively, an implied term of the Sales Representative Agreement was that it would not be viable after the termination of the M–K I–Bond business.

5. Defendant is entitled to judgment on all counts.

## DISCUSSION

A review of the two contractual instruments, the Sales Representative Agreement and the Partnership Agreement, and the surrounding circumstances shows that the two agreements form a single unified expression of the dealings between the parties. Both agreements were negotiated at the same time by the same parties and both were executed in July, 1974 and made effective as of April 1, 1974. Also, both agreements essentially concerned the same subject matter, the continuation of Intma's business of producing and selling bonded rail joints by the creation of a partnership between Intma and Morrison-Knudsen. The Partnership Agreement specifically referred to and was made contingent upon the execution of the Sales Representative Agreement. These and other factors, as noted in the findings of fact, lead us to conclude that the two agreements concern a single transaction and that they must be read together in determining the intention of the parties.

It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter that they should be construed together and interpreted as a whole. There is not "any requirement that a contract be evidenced by a single instrument" and "[i]f contracting parties choose,

they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of the true intent of the parties." *International Milling Co. v. Hachmeister, Inc.*, 380 Pa. 407, 417–18, 110 A.2d 186, 191 (1955) (citation omitted).

These rules apply even though the parties to the separate writings may not be the same as long as the writings pertain to the same transaction and interpretation is aided by reading them together. *See* 4 S. Williston, Contracts, § 628 (3d ed. 1961). In the instant case the parties to the two agreements are not the same. The Partnership Agreement was entered between Morrison-Knudsen and Intma and the Sales Representative Agreement was between Morrison-Knudsen and Hans Von Lange and his son, Richard Von Lange. The reason Intma was not a party to the Sales Representative Agreement was because the parties sought to avoid having Intma's many creditors attach any of the commissions earned under the agreement. We find it unnecessary to pierce the corporate veil in order to arrive at the conclusion that the parties are identical as it is clear that the two agreements are interrelated and that only by interpreting the two together can the true intent of the parties be understood.

■ The Sales Representative Agreement provided for a term of three years, as did the Partnership Agreement, and they both contained provisions for the event of either expiration of the term or termination. The Sales Representative Agreement does not provide for any method of termination. However, the Partnership Agreement provides that Morrison-Knudson could terminate the partnership at the end of any fiscal year upon giving Intma ninety-days notice. As noted in the findings of fact, Morrison-Knudsen actually provided Intma with notice that it intended to terminate the partnership at the end of 1974 and it was only due to Hans Von Lange's efforts that Morrison-Knudsen agreed to a six-month extension. Therefore, by applying the termination provisions of the Partnership Agreement and the subsequent extension agreement to the interrelated Sales Representative Agreement, it is clear that the Sales Representative Agreement terminated at the same date as the partnership arrangement.

The application of the termination clause of the Partnership Agreement to the interrelated Sales Representative Agreement is the most reasonable interpretation and the one that leads to the clearest ascertainment of the intent of the parties. A case which illustrates a similar interpretation of two interrelated instruments is *International Union of United Brewery v. Duke and Company, Inc.*, 373 F.Supp. 778 (W.D.Pa. 1974). That case involved a collective bargaining agreement which obligated the company to establish and maintain a pension plan for its workers and a pension trust agreement which set forth the terms and conditions of the plan and provided for termination of the plan. The pension plan was terminated by the brewing company when the plant was closed and the union contended that since the collective bargaining agreement obligated the company to maintain a pension plan and failed to provide for termination that the pension benefits survived the termination of operations. Judge Weber held that the two documents should be read together and that the company's right to terminate the pension plan applied to the collective bargaining agreement.

■ Alternatively, we find that an implied term in the Sales Representative Agreement was the continued existence of the partnership business. The reasons for implying the term of ongoing partnership business activity are: the Sales Representative Agreement concerned only the sale of bonded rail joints produced by the partnership; the $4,500 monthly payment was solely an advance against commissions to offset expenses in generating sales; the Von Langes under the agreement were to use their best efforts to obtain orders for bonded rail joints, and finally the Sales Representative Agreement specifically referred to termination before the expiration of the

three-year term. Clearly, the Sales Representative Agreement contemplated termination and the duties of the Von Langes were completely and solely based on the continuation of the partnership business. The only reasonable way to view the Sales Representative Agreement is that by implication it required the existence of the ongoing partnership business. Any other interpretation would be both unreasonable and inequitable.

 The law is clear that terms clearly implied from the entire contract and indispensable to effectuating the parties intentions should be considered a part of the contract. See *MacDonald v. Winfield Corporation*, 93 F.Supp. 153 (E.D.Pa.1950); *Frickert v. Deiter Bros. Fuel Co., Inc.*, 464 Pa. 596, 347 A.2d 701 (1975). Also, where there is no express provision in a contract as to its duration or termination the intention of the parties in that regard is to be determined from the surrounding circumstances and by the application of a reasonable construction to the agreement as a whole. See, *Thomas v. Thomas Flexible Coupling Co.*, 353 Pa. 591, 46 A.2d 212 (1946). In the instant case the nature of the Sales Representative Agreement and the surrounding circumstances show that the continued existence of the partnership was the foundation upon which the agreement to sell the partnership products was conditioned. This fact was essential to the Von Langes' performance. It therefore must be implied that the termination of the partnership business also terminated the Sales Representative Agreement. To give the Plaintiffs monthly advances against commissions they will not earn to cover expenses they will not incur would be an unreasonable interpretation and at odds with the underlying intention of the parties at the time of entering the contract.

Finally, the Sales Representative Agreement provided that on termination the Von Langes were entitled to receive commissions on all orders in process and received by the manufacturer. They have already been paid this amount and are entitled to no more.

An appropriate order will be entered.